1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9             CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| ERIC B. FROMER CHIROPRACTIC, INC., | Case No. CV 15-04767-AB (JCx) |
| Plaintiff, | **ORDER RE: PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR AWARD OF ATTORNEYS' FEES** (Dkt. Nos. 73, 74) |
| v. | |
| NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION, et al., | |
| Defendants. | |

        Pending before the Court are Plaintiff's Motion for Final Approval of Class Action Settlement and Motion for Award of Attorneys' Fees.  (Dkt. Nos. 74, 75.)  The Court conducted a hearing on July 10, 2017.  The Court will enter an Order approving the settlement.  This separate Order addresses the attorneys' fee request and the lead Plaintiff's incentive fee.

## I.  BACKGROUND

        Plaintiff alleged that Defendants violated the Telecommunications Practices Act by sending two unsolicited faxes on March 25 and 31, 2015.  Defendants sent these unsolicited faxes a total of 3,055 times, to a total 1,047 class members.

        The settlement agreement established a settlement fund of $1.1 million, and provided for a payment of up to $400 per claim.  The settlement provided that a

1.

1    minimum of $165,000 would be paid in claims to class members and to a cy pres

2    recipient; any unpaid remainder would revert to the Defendants.  Plaintiff would seek

3    an incentive award of $15,000, and Plaintiffs' counsel would seek 29% of the fund as

4    an award of attorneys' fees.

5         The Court preliminarily approved the settlement, notice was sent to class

6    members, and members filed claims.  A total of $125,600 will be paid in claims; this

7    equates to 314 claims.[1] The cy pres recipient will receive $39,400.

8    **II. ATTORNEYS FEES**

9         As noted, Plaintiff's counsel seeks 29% of the $1.1 million settlement fund as

10   attorneys' fees; this is $319,000.  The Court finds that award would be excessive.

11   Instead, the Court $106,177.50 in fees.

12   **A. Legal Standard**

13        With regard to awarding attorneys' fees to plaintiff's counsel after a class action

14   settlement, the Ninth Circuit has "determined that the choice between lodestar and

15   percentage calculation depends on the circumstances, but that either method may. . .

16   have its place in determining what would be reasonable compensation for creating a

17   common fund." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301,

18   1311 (9th Cir. 1990) (quoting *Paul, Johnson, Alston & Hunt V. Graulty*, 886 F.2d 268,

19   272 (9th Cir. 1989)) (internal quotation marks omitted); *accord In re Washington*

20   *Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1295 (9th Cir. 1994)

21   ("[T]he law of our circuit [is] that the district court has discretion to use either method

22   in common fund cases.").  Thus, "[u]nder Ninth Circuit law, the district court has

23   discretion in common fund cases to choose either the percentage-of-the-fund or the

24

25   ---

     [1]  The Motion for Final Approval provided incorrect information regarding the total

26   number of claims and the total payout. *See* Memo. (Dkt. No. 73), 4:13-14, p. 6. fn. 3.
     At the hearing, counsel corrected the errors. The corrected information is included in

27   this order.  It is unfortunate that counsel did not correct this information until the
     hearing.  In addition, the number of claims and the related data should have been

28   placed more intelligibly in the body of the memorandum instead of in a footnote.

1  lodestar method." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002);

2  *accord In re Mercury Interactive Corp.*, 618 F.3d 988, 992 (9th Cir. 2010).  "The

3  district court abuses its discretion when it uses a mechanical or formulaic approach

4  that results in an unreasonable reward." *Powers v. Eichen,* 229 F.3d 1249, 1256 (9th

5  Cir. 2000).  The district court's discretion to "choose which calculation method they

6  use . . . must be exercised so as to achieve a reasonable result." *In re Bluetooth*

7  *Headset Products Liability Litigation (In re Bluetooth)*, 654 F.3d 935, 942 (9th Cir.

8  2011) (citing *In re Coordinated Pretrial Proceedings*, 109 F.3d 602, 607 (9th Cir.

9  1997).

10       A Court awarding attorneys' fees in a common fund case  "should (1) decide

11  whether to treat the settlement as a common fund; (2) choose the lodestar or

12  percentage method for calculating a reasonable fee and make explicit calculations; (3)

13  ensure that the fee award is reasonable considering, *inter alia*, the degree of success in

14  the litigation and benefit to the class; and (4) if standard calculations yield an

15  unjustifiably disproportionate award, adjust the lodestar or percentage accordingly."

16  *In re Bluetooth,* 654 F.3d at 942.

17       **B. Application**

18            **1.  Common Fund and Fee Calculation Method**

19       First, the class action settlement fund here is plainly a common fund.

20       Second, the Court chooses to calculate the fee award based on the lodestar

21  rather than on a percentage.  This case was not so complicated or lengthy that it is

22  necessary to use a "percentage of the common fund in lieu of the often more time-

23  consuming task of calculating the lodestar." *In re Bluetooth*, 654 F.3d at  942.  Also,

24  the Court finds that, given the nature of this case and that the settlement fund is

25  reversionary, the fee request should be subject to the greater scrutiny inherent in the

26  lodestar method.

27            **2.  Calculation of the Lodestar**

28       "The lodestar calculation begins with the multiplication of the number of hours

reasonably expended by a reasonable hourly rate. The hours expended and the rate should be supported by adequate documentation and other evidence; thus, attorneys working on cases where a lodestar may be employed should keep records and time sheets documenting their work and time spent."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  "The resulting figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment."  *Id.*   Plaintiff calculates a lodestar of $201,853.75, for 339.25 hours worked at the hourly rate of $595.  The Court rejects this calculation.

### a.  Reasonable Hours

After reviewing Plaintiffs' counsel's billing records, Wanca Decl. (Dkt. No. 75) Ex. 6, the Court finds that counsel billed excessive hours for many tasks.

### i.   Hours Bills for Preparing October 2015 Joint Rule 26(f) Report After it was Filed

The parties filed their Joint Rule 26(f) Report on October 5, 2015.  *See* Dkt. No. 35.  On October 19, 2015, the Court stayed the case pending Supreme Court rulings in *Gomez v. Campbell-Ewald Co.* and *Robins v. Spokeo, Inc*.  Yet on November 18, 2015, some 6 weeks later, attorney Ryan M. Kelly ("Kelly") billed a total of 2.8 hours for "continue to draft Rule 26(f) report" and "Draft email to opposing counsel re: Rule 26f report."  It is not plausible that counsel continued to work on drafting the Joint Rule 26(f) report 6 weeks after it was filed.  Nor is it plausible that this task related to the second Joint Rule 26(f) Report because the Court did not order the parties to file it until June 2016.  The Court will therefore **deduct 2.8 hours** from the lodestar.

### ii.   Hours Billed for Preparing June 2016 Joint Rule 26(f) Report

After the Supreme Court issued its opinions, the Court lifted the stay and ordered the parties to file a new Joint Rule 26(f) Report.  *See* June 3, 2016 Order (Dkt. No. 50).  The parties filed their new Joint Rule 26(f) Report on June 23, 2016.  *See*

Dkt. No. 51.  Kelly billed 6.8 hours for drafting the new Joint Rule 26(f) Report even though Plaintiff's portions of the second Report are almost identical to those in the first Report.  The single difference the Court found from Plaintiff is the statement that it would oppose any motion to stay discovery.  The only other work Plaintiff contributed was to determine a schedule with Defendant.  Defendant made only slight changes to account for the posture of the case after the stay, but these did not require any work from Plaintiff.  It was not reasonable for Kelly to spend or bill 6.8 hours for the minimal work on the second Joint Rule 26(f).  The Court will award Plaintiff 2 hours instead.  The Court will therefore **deduct 4.8 hours** from the lodestar.

### iii.   Preparing Opposition to Motion to Dismiss and Preparing for Hearing

Attorneys Wallace M. Solberg ("Solberg"), Ross Michael Good ("Good"), and Kelly billed a total of 33.8 hours to draft, research, and complete the opposition to the motion to dismiss.  Solberg and Kelly billed an additional 29.95 hours to prepare for the hearing.  This totals 63.75 hours.  These hours are unjustified.

Drafting the opposition should not have taken 33.8 hours.  Defendants' motion to dismiss or stay dealt with the pending Supreme Court cases, whether the faxes were advertisements, whether the complaint stated a claim against one of the defendants, and preemption.  Although the Supreme Court cases were pending and therefore all parties awaited clear guidance, their potential impact on TCPA cases was well-understood, so briefing them should not have been very laborious, especially for a firm like Anderson + Wanca that specializes in TPCA class actions.  As for the issue of whether the fax here was an advertisement, Plaintiff's firm previously briefed that very issue in another TCPA case before this court, representing the same client.  *See Fromer Chiropractic v. SpendWell Health, Inc.*, CV14-08728-AB, Dkt. No. 32.  There is nothing wrong with recycling work product—why reinvent the wheel?—but doing so should have taken little time.  And, the other marginal grounds—failure to state a claim against one defendant, and preemption—are routine.  In short, the opposition

brief was recycled and routine, but the hours expended were extraordinary.  This is not reasonable.  The Court will award counsel 25 hours for work spent preparing the opposition brief.

Nor should Solberg and Kelly—who together claimed to have spent 28.05 hours drafting the opposition—have had to spend an additional 29.95 hours preparing for the hearing a mere 2-3 weeks later.  This time spent preparing for the hearing does not include time spent reviewing the reply; it is purely preparation for the hearing.  The Court will award counsel 10 hours for preparing for the hearing.

The Court will therefore award counsel a total of 35 hours preparing and filing the opposition brief, and to prepare for the hearing.  The Court will therefore **deduct 28.75 hours** from the lodestar for unreasonable hours billed in connection with opposing the motion to dismiss.

### iv.   Preparing Stipulation to Modify Class Certification Deadlines

By the Court's math, Kelly and Brian J. Wanca ("Wanca")  billed 10.9 hours — that is $6,485.50 —for preparing a stipulation to modify the class certification deadlines.  *See* Stipulation (Dkt. No. 30).  The stipulation is appropriately formulaic and only 1.5 pages long, and includes a several-line proposed Order.  Nothing in the billing records indicates that this very standard issue was contentious or that it should have taken anywhere close to 10.9 hours to prepare and file.  Indeed, the entries accounting for 8.5 of these hours pertain *solely to drafting the stipulation*.  Only the last entry, for 2.4 hours, includes any reference to communicating with defense counsel.  The Court can only speculate as to why counsel billed so many hours for this.  By contrast, the parties' stipulation to extend the briefing schedule on the motion to dismiss was more involved, *see* Dkt. No. 28, yet counsel billed far less for it—only 4.3 hours, which is still a lot.

The Court will award 2 hours for the stipulation to modify class certification deadlines.  The Court will therefore **deduct 8.9 hours** from the lodestar.

**v.**     **Double or Block Billing for Travel and Work on Another Case and Mediation**

On August 26, 2016, attorney Wanca billed 10.8 hours for the following: "Travel to and from medication [sic]; review Tag's response to Vertex's motion for summary judgment."  Puzzled about who Tag and Vertex are, the Court discovered that they are defendants in a TCPA case in which Anderson + Wanca represents the plaintiff.  *See Physician's Healthsource, Inc. v. Vertex Pharm. Inc.*, No. CV 15-11517-JCB, filed April 6, 2015 (D. Mass. Mar. 28, 2017); *see also Physician's Healthsource, Inc. v. Vertex Pharm. Inc.*, 2017 WL 1534221 (D. Mass. Mar. 28, 2017) (header identifying the Anderson & Wanca firm as plaintiff's counsel).  It appears that while Wanca was traveling for this case, he was reading filings from the Tag/Vertex case, yet billed all of the time to this case.  The Court does not know whether counsel *also* billed the same time to the Tag/Vertex case.  Double-billing is unethical unless the client expressly consents to it, and even where the client consents to a billing arrangement, a fee can nevertheless be unconscionable.  *See* Cal. State Bar Cmte., Formal Opinion No. 1996-147 (interpreting Cal. R. Prof. Conduct 4-200).  Because it is not clear that Plaintiff's counsel engaged in double-billing or whether Plaintiff consented to double-billing, the Court will not disallow the entry on that basis.

However, the 10.8 hours billed is nevertheless unreasonable.  Wanca is based in the Chicago area, and that is where the mediation took place, yet he billed 10.8 hours for "travel to and from medication [sic]".  Kelly billed only 7.5 hours to travel to and from the Chicago mediation, *and* to attend it.  Wanca's 10.8 hours simply make no sense unless they are also for attending mediation, which is not part of the task description.  Giving Wanca the benefit of the doubt, the Court will construe that time entry as including attending the mediation not just traveling to and from it.  However, the Court will award 7.5 hours—the same amount of time that Kelly billed to the same tasks.  The Court will **therefore deduct 3.3 hours** from the lodestar.

### vi. Preliminary Approval, Final Approval, and Attorneys' Fees Motions

The hours billed for preparing the motions for preliminary approval, final approval, and attorneys' fees are excessive. For these tasks, Patrick Solberg ("Patrick Solberg"), Wanca, Wallace Solberg, and Hara billed as follows:

- Preliminary Approval research and draft:          31.15 hours
- "Research for filing final settlement approval":   19.00 hours
- "Began drafting final settlement approval":        10.50 hours
- Research and draft fees motion:                    14.50 hours
- Complete final approval and fees motion:           6.50 hours
- **Total:**                                         **81.65 hours**

These hours were unreasonable on several grounds. These were formulaic, unopposed motions. The Anderson + Wanca firm, as indicated by its "Firm Profile" listing page after page of "certified class action cases" in which it was "[a]ppointed class counsel," *see* Wanca Decl. Ex. 2 (Dkt. No. 75-2) pp. 721-730, specializes in TCPA class action litigation. *See also Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 491 (7th Cir. 2013) ("Anderson + Wanca [is a] Chicago-area law firm[] that specialize[s] in representing plaintiffs in class action [TCPA] lawsuits.).[2] It is likely that the firm already has template motions they submit in class actions and therefore counsel either did or should have relied on existing work-product for the overwhelming bulk of their memoranda. Even if most of Anderson + Wanca's cases are in its home state of Illinois, it is certainly well-familiar with the law governing

---

[2]   For example, in researching the firm, the Court learned that it filed "over one hundred putative class actions under the Act, [] rooted in" its unethical use of a trove of data it recovered in an unethical manner from a third-party marketer. *See Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 492-493 (7th Cir. 2013) (describing the firm's means of obtaining the data and its use of it); *see also Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 915 (7th Cir. 2011), and *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723–24 (7th Cir. 2011).

TCPA cases and class action settlements such that tweaking its existing work product to a Ninth Circuit jurisdiction should not have been a demanding task.  It is perfectly sensible and efficient to re-use prior work product, but it is not ethical for counsel to bill for it as though they drafted it from scratch.  *See, e.g.*, ABA Comm. on Ethics and Professional Responsibility, Formal Op. 93-379 American Bar Association BILLING FOR PROFESSIONAL FEES, DISBURSEMENTS AND OTHER EXPENSES ("A lawyer who is able to reuse old work product has not re-earned the hours previously billed and compensated when the work product was first generated. . . . The practice of billing several clients for the same time or work product, since it results in the earning of an unreasonable fee, therefore is contrary to the mandate of the Model Rules. Model Rule 1.5.").  Indeed, Plaintiff's memoranda read as boilerplate: they reflect no legal research or analysis that is particular to this case; rather, they rely on generic legal standards that apply in all class actions.  Likewise, their application of these legal standards to this case is generic or conclusory.  Other elements are flat-out wrong: the motion for final approval states completely wrong information concerning the claims filed.  Most egregiously, the same motion includes a section regarding the "absence of collusion" wherein counsel correctly identifies Ninth Circuit law stating that a reversionary fund is one of three warning signs of collusion.  *See* Dkt. No. 73, 18:14-19:3.  **Counsel confidently declares "Not one of these 'warning signs' is present in this case," yet by its terms <u>the settlement fund here is reversionary</u> – an issue the Court raised at the preliminary approval hearing.**  These errors suggest either that the motion is largely copied from existing work-product (something the Court can't prove), was prepared carelessly, or both.  Regardless, the time counsel billed for these matters was unreasonable and excessive: either counsel billed for existing work-product as if it was drafted from scratch, or counsel drafted these motions from scratch when there was no need to and took far too long to do so.

In short, none of the above work product required the hours billed for it.  The 31.15 hours claimed for researching and drafting the preliminary approval motion is

especially unjustified, and it is inconceivable and absurd that counsel billed 19 hours for "research for filing final settlement approval". The final approval briefing was necessarily largely repetitive of the preliminary approval briefing, and included egregious errors, so the hours billed for drafting it is unreasonable. The fees motion is likewise entirely generic and lacks any meaningful attempt to prove up counsel's hourly rates (discussed below), so the hours billed to it were not reasonably expended.

Instead of the 81.65 billed for these tasks, the Court will award Plaintiff fees for 35 hours as follows:

- Research and draft preliminary approval motion:   15.00 hours
- Research and draft final approval motion:   10.00 hours
- Research and draft fees motion:   10.00 hours
- **Total:**   **35.00 hours**

Therefore, 46.65 hours billed for these tasks were excessive. The Court will **deduct 46.65 hours** from the lodestar.

### vii.   Research on Reversionary Funds

Kelly billed a total of 8.6 hours for researching whether reversionary funds are allowed in the Ninth Circuit. As noted below, none of Plaintiffs' claimed work on this issue is reflected in the papers, even though this issue is significant and unusual, and even though the Court inquired about it at oral argument. In fact, the final approval memorandum wrongly stated that this case did not involve a reversionary term. In addition, to the extent counsel did research this issue, 8.6 hours was unreasonable: the Court found the relevant case law in minutes. The Court therefore will award Plaintiff only 2 hours for researching this issue and will **deduct 6.6 hours** from the lodestar.

### viii.   Time Reviewing Docket Entries.

Plaintiff's counsel billed 0.3 or 0.4 hours for many tasks described as "Review minute order; diary and docket." Each 0.3 hour entry is worth $178.50. The Court has reviewed the docket corresponding to each and every such entry and finds that 6 of the 0.3-hour entries (7/21/15, 8/31/15, 10/5/15, 10/8/15, 10/20/15, 1/28/16) and one

10.

0.4-hour entry (10/19/16) could not have taken nearly the time billed because the items counsel was reviewing were insubstantial, such as an order granting a stipulation to modify the briefing schedule (time entry on 8/31/2015), or orders granting pro hac vice applications (time entries on 10/5/15 and 10/8/15).  Billing 0.3 or 0.4 for such tasks certainly results in inflated billing.  It appears from the time entries that Wanca + Anderson bills in 0.1 hour increments.  The Court will award 0.1 hours for each of these 7 entries, that is, a total of 0.7 hours instead of 2.2 hours. The Court will therefore **deduct 1.5 hours** from the lodestar.

### ix.    Hours Reasonably Expended

Based on the foregoing, the Court finds that 103.3 of the hours Plaintiff's counsel billed were not reasonable necessary.  The Court will therefore deduct 103.3 hours from the 339.25 hours that Plaintiff's counsel billed, to establish the number of hours reasonably expended on this matter.

**Hours Reasonably Expended = 339.25 – 103.3 = 235.95**

### b.  Hourly Rate

Plaintiff seeks an $595 hourly rate, but the motion is devoid of evidence that can justify this rate.  At the outset, the Court notes an error: although counsel seeks a rate of $595 for all hours worked, the billing records show that attorney Good billed 4.5 hours at $495/hour.  More problematic, counsel presented no truly probative evidence that would establish that the $595 hourly rate is reasonable.

An attorney's rate is "reasonable" for the purpose of a fee award if it comports with "prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Van Skike v. Dir., Office of Workers' Comp. Programs*, 557 F.3d 1041, 1046 (9th Cir. 2009).  The relevant community is generally defined as "the forum in which the district court sits." *Barjon v. Dalton,* 132 F.3d 496, 500 (9th Cir. 1997).  To determine whether a rate falls within the scope of "prevailing market rates," courts consider rates charged by other "attorneys in the relevant community engaged in equally complex Federal litigation,

1    no matter the subject matter" for "for similar services by lawyers of reasonably

2    comparable skill, experience and reputation." *Prison Legal News v. Schwarzenegger*,

3    608 F.3d 446, 455 (9th Cir. 2010) (internal quotes omitted).   Attorney declarations

4    regarding prevailing fees in the community and rate determinations in other cases "are

5    satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v.*

6    *Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  The rates counsel

7    customarily bills clients is also probative because it evinces "the actual rate that [the

8    attorney] can command in the market . . ." *Elser v. I.A.M. Nat. Pension Fund*, 579 F.

9    Supp. 1375, 1379 (C.D. Cal. 1984) (internal quotes omitted); *accord Maldonado v.*

10   *Lehman*, 811 F.2d 1341, 1342 (9th Cir. 1987) ("evidence of counsel's customary

11   hourly rate may be considered by the District Court" as one factor in determining the

12   reasonable market rate).

13        Here, the only evidence that counsel submitted is (1) the billing summary

14   showing rates of $495 and $595, and (2) awards to other counsel in three other cases.

15   This evidence does not support the requested hourly rate.

16        As for the rates reflected on the billing summary, there is no evidence that the

17   Anderson + Wanca firm actually bills any clients either $495 or $595 per hour.  Nor

18   does the Wanca Declaration says anything about the rates the firm actually charges

19   anyone.

20        Nor are the cases Plaintiff relies on probative.  Plaintiff points to three cases in

21   which Central District courts approved hourly rates ranging, according to Plaintiff,

22   from $150/hour to $1,000/hour, and from this range urges that the Anderson + Wanca

23   attorneys are entitled to $595/hour.  *See* Mot. (Dkt. No. 74) 12:27-13:9.  On its face,

24   this range is so broad that it provides no guidance for setting an actual hourly rate for

25   counsel here.  Counsel's unreflecting reliance on this range suggests that *any* rate

26   within it would be presumptively reasonable, including a rate of $150.

27        The Court also thoroughly rejects Plaintiff's claim that these cases involved

28   "work similar to that performed by Class Counsel in this case."  Mot. 12:27-13:1.

12.

These three cases were vastly more complex than this simple TCPA case.  *Parkinson v. Hyundai Motor America*, 796 F. Supp. 2d 1160 (C.D. Cal. 2010) involved a vehicle defect, the litigation had some complexity typical of nationwide consumer class actions, and the litigation stretched over four years.  *Pierce v. County of Orange*, 905 F. Supp. 2d 1017 (C.D. Cal. 2012) was a complex prisoner § 1983/ ADA class action that lasted over 10 years and bears no similarity whatsoever to this case.  And *Kearney v. Hyundai Motor America*, 2013 WL 3287996 (C.D. Cal. June 28, 2013) was "a nationwide class action that was vigorously defended by skilled counsel and required analysis of complex technical systems" related to defective airbag systems.  These cases are dissimilar in every relevant way from this simple TCPA case.   Surely courts in this district have awarded attorneys' fees in TCPA or similar class actions, so counsel could have easily found and presented the rates from those cases.  But counsel did not.  Nor did counsel clearly lay out the experience of each of the attorneys but instead expects the Court to pick this data out of the "Firm Profile" exhibit.  Despite the burden being on the movant to supply evidence sufficient to establish an hourly rate, counsel did not make even a minimal effort.

Yet the Court must select *some* hourly rate.  Certainly a reasonable rate falls within the $150 to $1,000 range that counsel proposes.  Given the simplicity of this case, its utter lack of complexity or difficulty, and the elementary legal and factual issues involved, it did not take much skill or experience to file the action and secure the settlement herein.  Nor, as stated above, did the submissions before the Court in fact reflect much skill.  Plaintiff simply failed to submit evidence adequate to meet its burden of establishing that $595 is a reasonable rate for Plaintiff's counsel in this case.  Based on the Court's own familiarity with the market rate for comparable Los Angeles lawyers doing comparable work, the Court finds that an **hourly rate of $450** is a reasonable market rate.

### c.  Lodestar Calculation

The lodestar calculation is:  **235.95 hours x $450/hour  = $106,177.50**

### d. Reasonableness of Lodestar

As noted above, "[t]The resulting [lodestar] figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Hanlon*, 150 F.3d at 1029.  Having considered these factors, the Court finds that the lodestar as calculated reasonably approximates the actual value of Plaintiff's counsel's services and declines to adjust it.

As for the benefit obtained for the class, the litigation was successful in that it granted class members the opportunity to make claims of up to $400 per unsolicited fax.  This is close to the $500 statutory damages that the TCPA authorizes.  On the other hand, only 319 claims were submitted, for a total of $125,600 going to class members and $39,400 going to the cy pres recipient.  The remainder will to revert to Defendants.  The circumstances do not warrant either an upward or downward adjustment.

As for the risk of nonpayment, it was marginal, and certainly lower than in almost any other kind of case.  This was essentially a "gotcha" case: given a client who received a clearly unsolicited mass fax, the case was easy to prove.  Plaintiff's counsel admitted as much at the hearing.  As many courts have noted, the TCPA is essentially a strict liability statute in that liability is established by the act of sending the unauthorized fax, and intent is irrelevant.  *See, e.g., Universal Underwriters v. Lou Fuze Auto. Network, Inc.*, 401 F.3d 876, 882 (8th Cir. 2005) ("[I]ntent is not a prerequisite to liability under the [TCPA].").  Identifying class members was straightforward since they are the fax recipients, and it is hard to imagine a more straightforward case for class certification.  In addition, given that the TCPA provides for generous statutory damages, there were no evidentiary obstacles to overcome to win substantial damages.   The risks here were minimal.

As for the difficulties of pursuing this case, and the complexity and novelty of the issues presented, at oral argument Plaintiffs' counsel stated they had to obtain

14.

some records from a warehouse in Canada, and pointed to Defendant' Motion to Dismiss. But it did not appear to take any special effort to obtain the records from the Canadian warehouse. Nor was the motion to dismiss extraordinary; indeed, its main argument was that Plaintiff's lacked standing. Had Defendants prevailed, this case would have ended early on. In any event, the Court stayed this case pending the two Supreme Court rulings, and the case settled shortly after it was reopened. The Court concludes that neither the Canadian records nor the motion to dismiss establish that this case was difficult by any measure. In summary, the risk and difficulty involved in this case were minimal.

Finally, the quality of representation here weighs especially heavily against increasing the award. As noted above, this type of case does not require much skill to pursue, and this case in particular was especially clear-cut. From the Court's perspective, Plaintiffs' settlement-related court filings and appearances reflected minimal effort. All of the law cited was generic, and the analysis was likewise generic or conclusory; while this is generally appropriate for routine class action settlements like this one, the fact remains that the effort expended and was slight. Similarly, when the Court inquired about the $15,000 incentive payment requested for the named Plaintiff, counsel at the preliminary approval hearing stated to the effect that $15,000 is what they routinely ask for and receive, while counsel at the final approval hearing was evasive as to what work the named Plaintiff actually did. The Court got the distinct impression that class counsel expected the Court to rubber-stamp these motions. Furthermore, the current briefing was plagued with errors on all of the most salient information—the number of claims made and the amounts to be paid—that counsel did not correct until prompted at the hearing. The parties' Preliminary Approval Order also had errors that the Court had to bring to counsel's attention.

Worst of all, neither the preliminary nor the final approval briefing addressed the propriety of reversionary settlement funds—the kind of fund here—even though

they are problematic and even though Plaintiff's counsel claim they spent 8.6 hours researching the issue. *See Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015) ("when the parties create a reverter that returns unclaimed fees to the defendant," that is one of three "subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations.") (citing *In re Bluetooth*, 654 F.3d at 938. As officers of the Court, counsel should have brought this significant issue to the Court's attention unprompted. But the Court did prompt counsel, and even so, they still failed to address it. At the preliminary approval hearing, the Court asked counsel to address the reversionary term, and counsel did not provide a satisfactory response. And despite the Court's inquiry at the preliminary approval hearing, the final approval briefing remained silent on the issue. More accurately, the final approval briefing correctly noted *In re Bluetooth*'s reference to a reversionary fund as being one of three subtle warning signs of collusion, yet incredibly, the brief wrongly stated that none of these signs, including a reversionary fund, is present in this case.[3]

While all of the errors and shortcomings in Plaintiff's settlement filings showed little effort was expended by counsel resulting in subpar quality work, they only multiplied the effort the Court had to expend to adjudicate them. And these are unopposed motions. All of this tends to show that the quality of representation here does not warrant any multiplier.

Finally, the Court finds that its lodestar calculation does not yield a disproportionate award. The percentage-of-fund method, assuming a 25% benchmark, would have yielded an award of $275,000. Obviously, the Court's $106,177.50

---

[3]  The Court on its own finds that the reversionary term here does not detract from the reasonableness of the settlement. Reversionary funds are concerning insofar as they may indicate that class counsel and defense counsel struck an agreement favorable to class counsel and defendant, and to the detriment of class members. Here, however, notice was given to nearly all class members directly and the claims process was simple. Therefore, most class members had the opportunity to file a claim, but for some reason many did not. The small number of claims was not the result of the claims process being unnecessarily complicated and therefore favorable to Defendant.

1   lodestar-based award is far less.  But this only means that one of these measures is

2   unreasonable.  The Court finds that its lodestar calculation—which eliminated hours

3   unreasonably billed to this case and is based on a justifiable hourly rate—

4   demonstrates that the percentage-of-the-fund method would have yielded an

5   indefensibly high attorneys' fee that would have amounted to a windfall.  The Court

6   finds that the lower lodestar amount is warranted based on all of the circumstances

7   discussed above.  In short, the lodestar amount is not disproportionately low or high.

8   None of the relevant factors weigh in favor of either a premium or discount or other

9   departure from the lodestar.  The lodestar the Court calculated best approximates the

10  actual market value of counsel's work on this case.[4]

11          For the foregoing reasons, the Court awards Plaintiffs' counsel $106,177.50  in

12  attorneys' fees.

13  **III.   INCENTIVE AWARD**

14          Named Plaintiff seeks an incentive award of $15,000.  Named plaintiffs in class

15  actions "are eligible for reasonable incentive payments."  *Staton v. Boeing Co.*, 327 F.

16  3d 938, 977 (9th Cir. 2003).  The factors to be considered in the award of incentive

17  payments include "the actions the plaintiff has taken to protect the interests of the

18  class, the degree to which the class has benefitted from those actions, . . . . the amount

19  of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e]

20  fear[s of] workplace retaliation."  *Id.*

21          Here, the preliminary approval and attorneys' fees briefing referred only

22  generically to the named Plaintiff's actions, saying he "filed and pursued the action . .

23  . responded to discovery . . .  and stayed involved and informed."  Memo. 14:6-8.  At

24

25  [4]   Having reviewed counsel's billing entries, the Court is not confident that the hours
    billed are free of inflation, padding, or unreasonable tasks, even after the Court's
26  reductions.  Insofar as this case might warrant even a minimal premium corresponding
    to the minimal risk, difficulty, and skill involved, the Court is confident that such a
27  premium is already reflected in its lodestar.

28

the hearing, it became clear that named Plaintiff—which is a business, a chiropractor's office—was not deposed and did not contribute any other significant work, nor was there a risk of workplace retaliation here.  Counsel did not quantify the named Plaintiff's time investment in any way.  Absent any evidence that named Plaintiff contributed more than its name and the willingness to litigate over its receipt of 2 unsolicited faxes at a business fax machine, the Court concludes that Plaintiff's efforts were modest.  *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 571-72 (7th Cir. 1992), 962 F.2d at 571–72 (upholding district court's refusal to make any award to named plaintiff who sought $10,000 "for his admittedly modest services") (cited with approval in *Staton*, 327 F. 3d at 977).   An incentive award of $15,000 would be excessive for Plaintiff's modest efforts.  The Court instead awards Plaintiff a correspondingly modest incentive award of $1,000.  More would be a windfall.

## IV.    CONCLUSION

The Court awards counsel $106,177.50 in attorneys' fees, and the named Plaintiff $1,000 as an incentive award.  These amounts will be reflected in the Order Granting Final Approval.

**IT IS SO ORDERED.**

Dated:  September 22, 2017        _____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

18.